2022 IL App (2d) 210608-U
No. 2-21-0608
Order filed September 7, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF LORENA K. MILLER, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 05-D-313 |
| | ) | |
| JEFFREY A. MILLER, | ) | Honorable |
| | ) | Rene Cruz, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Bridges[1] concurred in the judgment.

**ORDER**

*Held*:  The trial court erred in granting respondent's petition for declaratory relief and in denying petitioner's petition for declaratory relief. Consequently, the subsequent order denying petitioner's motion to reinstate maintenance or to modify the judgment must be vacated.  Reversed in part, vacated in part, remanded with directions.

---

[1]Justice Bridges participated in this appeal, but has since been assigned to the Fourth District Appellate Court. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

¶ 1     In the third appeal before this court concerning these parties, petitioner, Lorena K. Miller, appeals the trial court's orders granting respondent's, Jeffrey A. Miller's, declaratory judgment action, denying her declaratory judgment action, and denying her petition to reinstate maintenance. For the following reasons, we reverse in part, vacate in part, and remand with directions.

¶ 2                              I. BACKGROUND

¶ 3                          A. Dissolution Judgment

¶ 4     The arguments currently being raised on appeal require a detailed summary of the history of this litigation.

¶ 5     In 2007, Lorena and Jeffrey divorced after 25 years of marriage.  In part, the February 9, 2007, dissolution judgment, provided that, at all times during the 25-year marriage, Jeffrey was the primary breadwinner and Lorena sacrificed employment and educational opportunities to fulfill the duties of her role as a full-time homemaker.  The trial court, Judge Robert Spence presiding, found that Lorena was unemployed, her past employment experience earned income much lower than that which could support the lifestyle the parties enjoyed during the marriage, and that she would never have an earning capacity similar to Jeffrey.  As such, "[t]he Court having considered all of the facts of this case, finds that this is an appropriate case for maintenance and that the maintenance should be permanent." It initially ordered that, for four years, Jeffrey would pay permanent maintenance in the amount of 45% "of the net of Jeffrey's gross income," up to a maximum of $500,000 annually, to be paid at a rate of $6000 monthly with the balance to be paid by May of the following year.  The court found that the four-year period would allow Lorena time to complete her education.  Following the initial four-year period, the court ordered that Jeffrey would pay 25% of his net income as permanent maintenance on any income he received up to a gross income of $500,000 annually.  The judgment defined "income" as "all income from any

source, including but not limited to, bonus income and income from the exercise of stock options or stock grants. For income exceeding *** $500,000 there shall be no maintenance paid." The judgment provided "the maintenance shall be permanent, subject to the statutory terminating provisions as found in 750 ILCS 5/510(c) [of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/510 (West 2016))]."[2]

¶ 6      Both parties filed posttrial motions which, in part, requested modifications to the judgment's maintenance provisions. Specifically, on March 7, 2007, Lorena moved the court to change her award to reflect a percentage of Jeffrey's gross income, instead of his net income. She also noted that, by giving him sole control over when he exercised future stock options and grants from which she was to receive maintenance, Jeffrey could manipulate the timing to reduce his support. Jeffrey, in turn, filed a posttrial motion on March 9, 2007, alleging that the definition of income was too broad, as it included income from investments that might be derived from gains resulting directly from his employment and, thus, creating a "double dipping" scenario. He argued that the definition of income should be limited to "sources of income derived directly from his employment (W-2 statement), not from investments as a result therefore, or other efforts ***." Further, Jeffrey argued that maintenance to Lorena should have been denied, permanent maintenance should have been denied, and/or maintenance should terminate permanently after four years.

---

[2]In sum, upon death of either party, remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis. 750 ILCS 5/510(c) (West 2008).

¶ 7    On June 28, 2007, the court ordered the parties to present to the court and exchange with each other maintenance analyses for determining "net and gross income and percentages" for maintenance purposes.  In the meantime, on July 17, 2007, the court entered an order addressing other issues raised by the parties postjudgment.  In that order, the court noted that future stock grants, options, dividends, and bonuses granted after the 2007 judgment would be considered income for maintenance purposes. It reserved the issue of whether it would "adjust the definition of maintenance contained in the original [judgment] concerning net versus gross and percentage." The court ordered the parties to submit "spreadsheets, FinPlans, or other financial analyses and/or memoranda indicating how support should be paid and the ultimate division of income which would occur *if gross income is substituted for net income*."  (Emphasis added.)  Further, the court noted that, after reviewing the financial data, it would issue its final ruling concerning maintenance.   The order denied Jeffrey's motion to modify maintenance.

¶ 8    On September 20, 2007, Judge Spence issued a written opinion letter, resolving the posttrial maintenance issues, noting that, because he had requested information from the parties concerning whether maintenance should be a percentage of gross income or net income, he had reserved ruling on that issue.  Judge Spence found that the procedure for calculating the appropriate amount of maintenance would be greatly simplified if it were calculated based upon gross income. Accordingly, he found that the 2007 judgment should be amended to order Jeffrey to pay "41.44% of his gross income up to a maximum of $500,000 gross income for a period of 4 years."  In addition, the judgment should be amended such that, at the conclusion of the four-year period, Jeffrey would pay "21.44% of his gross income up to a maximum of $500,000 gross income." Lorena's attorney was directed to draft an order consistent with the ruling, submit it to Jeffrey's attorney, and then submit it to the court.

¶ 9     On October 4, 2007, Lorena's attorney filed a short, three-page draft order that essentially mirrored the language in Judge Spence's opinion letter. That order appears in the record unsigned. On December 18, 2007, Lorena's counsel filed a second, eight-page draft amended order on posttrial motions. With respect to maintenance, that order appears to be identical to the one later signed by Judge Spence on January 8, 2008. The January 8, 2008, order attached the opinion letter as an exhibit and incorporated it as part of the order. It also incorporated by reference the transcript on posttrial motions for purposes of clarification.[3]  Further, the order stated that it replaced the July 17, 2007, order in its entirety. With respect to maintenance, the 2008 amended order provided,

"6.      In the July 17, 2007, Order *** this Court reserved the issue of whether or not it would adjust the definition of maintenance contained in the original [judgment] concerning net versus gross and percentage. The Court finds that the procedure for calculating the proper amount of maintenance owed by [Jeffrey] would be simplified greatly if the maintenance was calculated as a percentage of gross income rather than a percentage of net income.

7.      Accordingly, rather than ordering [Jeffrey] to pay 45% of his net income up to a maximum of $500,000 annually, for a period of 4 years, the [judgment] shall be amended to order [Jeffrey] to pay 41.44% of his gross income from his employer up to a maximum of $500,000 gross income, annually, for a period of 4 years from the date of the [judgment].

8.      At the conclusion of the 4-year period, rather than ordering [Jeffrey] to pay 25% of his net income up to a maximum of $500,000 annually, the [judgment] shall be amended to order [Jeffrey] to pay 21.44% of his gross income as and for maintenance up to a

_____

[3] Those transcripts do not appear in the record.

maximum of $500,000 gross income from his employer annually. *These percentages apply to Jeffrey Miller's earnings from employment* (salary, bonuses, grants and options granted after the date of dissolution) *not predecree grants, bonuses and options which have been previously divided in the property division and not income earned on Jeffrey Miller's share of these assets or other passive income*.

9.      Any income reported on Jeffrey Miller's tax returns or received by Jeffrey Miller as a result of Lorena Miller's exercise of her share of Jeffrey Miller's existing stock options and grants through the date of [the judgment] shall not be considered income to Jeffrey Miller for purposes of his maintenance of child support obligations. However, *post decree future stock grants, options, dividends and bonuses granted after the date of [the judgment], February 9, 2007, shall be considered part of his income for maintenance purposes*.

***

16.      Jeffrey Miller is to make additional maintenance and child support payments in the amount and as contained in the original [judgment] from his sources of income as defined in the [judgment] and as heretofore mentioned by 1st day of May each year and shall supply [Lorena] with this payment; complete copies of his Federal and State income tax returns, schedules and attachments; any documentation from his employer indicating grants, options, bonuses, deferred compensation or other forms of compensation from his employer shall also be provided to her by the 1st day of May each year so that she can determine whether or not she has been paid the proper additional support ***.

***

26.      Jeffrey Miller's motions to modify child support and maintenance are denied.

*\*\**

28.     The remaining provisions of the [judgment] entered on February 9, 2007, which are not contradicted or modified by this Order shall remain in full force and effect. \*\*\*."

(Emphases added.)

¶ 10     The record contains a form order entered a little more than one year later, on March 9, 2009, entitled "order for support" and a box checked "initial order" appears in the record, ordering Jeffrey to pay maintenance in the amount of $6000 monthly, "plus a yearly true-up payment per the Judgment." The order states that payment begins on February 9, 2007.

¶ 11     On February 9, 2011, exactly four years after the 2007 judgment was entered, Jeffrey filed a "motion for modification of support." Specifically, he requested that the court enter a modified order for support "pursuant to the terms and conditions of the parties' [judgment] previously entered herein on February 9, 2007." The notice of motion requested a hearing *instanter*. A handwritten "agreed order" that day reflected that the matter was before the court on Jeffrey's notice and motion to file a modified order for support, with Jeffrey represented by counsel and Lorena not appearing and not objecting. The court granted Jeffrey's motion to file a modified order for support. Thus, on February 9, 2011, a modified order for maintenance support was filed, reflecting that, starting on February 9, 2011, maintenance payments would be $3000 monthly, "plus a yearly true-up payment, if any, per the judgment." In addition, an "order/notice for income withholding" was filed, instructing Jeffrey's employer to withhold $3000 monthly.

¶ 12                          B. First Appeal

¶ 13     In 2013, Jeffrey (who had re-married) petitioned the trial court pursuant to section 510(c) of the Dissolution Act to terminate maintenance on the bases that Lorena was involved in a conjugal relationship and that she had failed to make good-faith efforts to secure employment.

The trial court granted the petition on the first basis, but this court reversed. See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 74 (*Miller I*). In part, we noted that, after the initial four years postjudgment, Jeffrey had been ordered to pay permanent maintenance at a rate of 21.44% of his income, accomplished by paying $3000 monthly with an annual "true-up." *Id.* ¶ 4. Further, we reversed the trial court's termination of maintenance and, upon doing so, reinstated "the most recent maintenance award retroactive to the date of the trial court's order." *Id.* ¶ 74.

¶ 14                                   C. Second Appeal

¶ 15     In September 2018, Jeffrey again petitioned to "modify/terminate maintenance," this time in response to his retirement. His petition alleged that the judgment dissolving the marriage was entered on February 9, 2007, and it obligated him to pay Lorena maintenance. He further alleged that, in August 2018, his company eliminated his position, such that, on October 1, 2018, his job would end, and he would receive six months of severance pay. As Jeffrey was approaching normal retirement age and was precluded from working in his current field due to the terms of a 12-month, non-compete agreement, he intended to retire from gainful employment. Jeffrey alleged that the termination of his employment and his good-faith intention to retire constituted a substantial change in circumstances warranting the termination of his maintenance obligations. Ultimately, a full evidentiary hearing was held and, thereafter, on May 6, 2019, the trial court modified maintenance by reducing payments to $1300 monthly. Further, the court ordered that the payment amounts would again be reviewable once Lorena became eligible for Medicare.

¶ 16     Lorena appealed. She argued that the court erred in finding that Jeffrey's change in employment status, alone, constituted a substantial change in circumstances warranting both a drastic reduction in maintenance and future review of her "permanent" maintenance.

¶ 17    In his response brief on appeal, Jeffrey opened his statement of facts by quoting portions of the January 8, 2008, order, asserting that the trial court set his maintenance obligations as a percentage of his gross income for the first four years postjudgment, and at a reduced percentage of his gross income after those initial four years. His argument section was then divided into two overarching sections. First, Jeffrey argued that the court properly found that his involuntary loss of employment constituted a substantial change in circumstances warranting a modification of his maintenance obligations. Second, Jeffrey argued that the trial court also properly applied the Dissolution Act's statutory factors to set his new, reduced maintenance obligation. Within this second section (specifically in his brief's final paragraph immediately preceding his conclusion), Jeffrey asserted that, as a practical matter, the maintenance award needed to be modified, because otherwise, given the language of the original dissolution judgment, as modified in the 2008 posttrial order, his maintenance obligation would be reduced to zero because he had no income from employment. He further asserted that, other than to suggest that his petition should be denied, Lorena failed to argue to this court what the correct amount of maintenance should be. In his conclusion, Jeffrey summarized his position that the trial court's finding of a substantial change in circumstances was correct, its modification of the obligation to $1300 monthly was appropriate, and he requested that we affirm the court's decision "in all respects." At oral argument, Jeffrey also commenced his argument by proclaiming that, under the original judgment, his maintenance obligation was tied to employment and, so, as a practical matter, denying his petition reduced his obligation to zero, but "nobody" was asking for that result. He repeated this position later in the argument, although the crux of the oral argument focused on the propriety of the trial court's ruling.

¶ 18    We outright reversed the trial court's order, concluding that there was no evidence from which the trial court could have reasonably found that continuing to pay the existing maintenance

obligation would unduly compromise Jeffrey's ability to meet his own needs. *In re Marriage of Miller*, 2020 IL App (2d) 190451, ¶ 44 (*Miller II*). Further, we stated,

> "In sum, the court's finding that Jeffrey met his burden of establishing that he suffered a substantial change in his financial resources that, in fact, impaired his ability to satisfy the full support amount was unreasonable. The court ruled in Jeffrey's favor, but did not answer the central question. As the substantial change in circumstances necessary to warrant a reduction in maintenance was not established, our analysis ends here. We reverse." *Id.*, ¶ 46.

As such, having found that the court erred in finding a substantial change in circumstances that impacted Jeffrey's continued ability to pay maintenance, we did not address the parties' arguments concerning whether the court properly applied statutory factors to arrive at a modified maintenance figure. Our decision was filed on April 27, 2020, and our mandate issued on July 15, 2020.

¶ 19                                    D. Present Appeal

¶ 20                                 1. Declaratory Judgment

¶ 21    On July 31, 2020, Lorena filed with the trial court a three-count "complaint for declaratory judgment, petition for rule to show cause and other relief." First, she noted that this court's decision reversing the trial court (*i.e.*, *Miller II*) restored the parties to the status quo that existed prior to the trial court's May 2019 order modifying maintenance. Prior to May 2019, Jeffrey, pursuant to the February 9, 2011, order, had paid Lorena $3000 monthly, plus a yearly true-up per the judgment. However, since June 30, 2020, Jeffrey had refused to resume maintenance payments, claiming, based upon his interpretation of the January 8, 2008, order modifying the judgment, his maintenance obligations were based upon his employment and, since he was no longer employed, he no longer owed Lorena any maintenance. Lorena sought a declaration that

Jeffrey's maintenance obligation remained $3000 monthly, retroactive to May 1, 2019. Next, Lorena argued that, notwithstanding this court's order, Jeffrey refused to make payments and owed her past due maintenance in the amount of $48,000, that his refusal to comply with the February 9, 2011, order was without reasonable cause or justification, and that she incurred additional costs and attorney fees to secure his compliance. Thus, she requested that Jeffrey be ordered to show cause as to why he should not be held in contempt of court. Finally, Lorena petitioned for attorney fees she incurred prosecuting her successful appeal.

¶ 22    On August 18, 2020, Jeffrey responded to Lorena's petition. In relevant part, he agreed that *Miller II* reversed the trial court's modification of maintenance and returned the parties to their status quo. However, he denied that the February 2011 order (setting monthly maintenance at $3000, plus a true-up under the judgment) governed the parties' status quo or his maintenance obligation. Rather, he argued, the 2011 order was simply derivative of and dependent upon the January 8, 2008, amended order that:

> "At the conclusion of the 4-year period, rather than ordering [Jeffrey] to pay 25% of his net income up to a maximum of $500,000 annually, the [judgment] shall be amended to order [Jeffrey] to pay 21.44% of his gross income as and for maintenance up to a maximum of $500,000 gross income from his employer annually. *These percentages apply to Jeffrey Miller's earnings from employment* (salary, bonuses, grants and options granted after the date of dissolution) *not predecree grants, bonuses and options which have been previously divided in the property division and not income earned on Jeffrey Miller's share of these assets or other passive income.*" (Emphasis added.)

As such, Jeffrey argued, his maintenance obligation was 21.44% of his income from only employment (which was now zero).

¶ 23    In addition, Jeffrey filed his own petition for declaratory judgment. In his petition, Jeffrey quoted the maintenance provisions from the February 9, 2007, dissolution judgment, as well as from the January 8, 2008, amended order. Jeffrey further asserted that his employment terminated in 2018 and, since January 1, 2019, he has had no income from employment. Jeffrey alleged that, since Lorena had taken the position that he had an ongoing obligation to pay her maintenance, even in the absence of employment, a genuine dispute existed between the parties as to the meaning and effect of the February 9, 2007, judgment, and the January 8, 2008, amended order. He requested that the court resolve the dispute and declare that (1) his maintenance obligation was to pay 21.44% of his gross income from employment to Lorena; and (2) he had no maintenance due and owing after January 1, 2019, because he had no income from employment at that time.

¶ 24    In addition to answering each other's petitions, the parties filed memoranda in support of their positions. In part, Lorena argued that *res judicata* barred the claims raised in Jeffrey's petition.

¶ 25    On November 2, 2020, the court, Judge Rene Cruz presiding, held a remote hearing on the parties' motions for declaratory judgment.[4] In sum, Lorena argued that the February 2011 order governed; the 2011 order removed any prior requirement tying maintenance to employment and, instead, required a $3000 monthly payment from whatever source available; and that Jeffrey's current claim was barred by *res judicata*, particularly because his 2018 motion to modify or terminate maintenance was entirely premised on his loss of employment, yet he did not at that time

---

[4]In his memorandum in support of his motion for declaratory judgment, Jeffrey explicitly asked that the court confirm that his "present maintenance obligation is $0.00 based on the fact that he has no income from employment."

argue that, because he was no longer employed, and the 2008 order tied maintenance to his employment, there was no existing maintenance order by which he could be ordered to pay.

¶ 26    Jeffrey, in turn, argued that the 2011 order, like other temporary orders before it, was akin to a derivative order or a support order that implemented the court's 2008 amended judgment order and facilitated Lorena receiving the maintenance.  It was not a "replacement" order to the 2008 order, and it did not eliminate the 2008 order's language tying the percentage of maintenance to Jeffrey's employment income.  More specifically, it was entered pursuant to Jeffrey's motion to modify the clerk's earlier *support* order, in accordance with the judgment, *not* a motion to modify the judgment itself.  His counsel argued,

> "In the amended order on posttrial motions [*i.e.*, 2008 order] the definition of income on
> which maintenance is payable changes dramatically, specifically to only include income
> from employment and to exclude passive income on investments or any other income other
> than his income from employment. That was a significant change from the original
> judgment on February 9th, 2007, and the underlying letter decision to the amended order
> on posttrial motions that was entered on January 8th, 2008."

As such, he argued, to suggest that, when Jeffrey moved in 2011 to modify the support order, "there was an intention of the parties to no longer limit maintenance to income from employment and to basically set a minimum maintenance obligation of $3,000 per month, [   ] that's simply not correct."  He asserted that Lorena was trying to "latch onto something as a way to not have to file [her] own petition to modify maintenance to reestablish the obligation and a dollar amount. But the existing order that this Court is bound by is the amended order on posttrial motions entered January 8th, 2008, and absolutely no order that's been entered since then modifies that obligation in any way."

¶ 27    As to Jeffrey's failure to raise this argument in the 2018 proceedings, his counsel queried:

"[W]hy would he bring it up? The petition was to terminate maintenance. It's clear under the terms of the judgment and the amended order on posttrial motions that it's permanent maintenance, so the only way to terminate the maintenance is to file a petition to terminate it under section 510, which is what [Jeffrey] did.

If Lorena Miller wanted to modify the maintenance to make it based on something other than income from employment then it would have been—the burden would have been on her to file the petition and would have been on her to prevail in a hearing, not on [Jeffrey]. *Why would he bring a petition to modify his maintenance above zero? If the current maintenance order obligates him to pay zero why would he seek to modify it*?" (Emphasis added.)

¶ 28    The court clarified that Jeffrey's 2018 "motion to modify/terminate maintenance" had requested, in his prayer for relief, that maintenance be terminated. Ultimately, the court had only reduced the amount. It asked Jeffrey's counsel whether, instead, it should have terminated maintenance, due to Jeffrey's loss of employment, or left maintenance intact and unmodified. The following exchange occurred:

"COUNSEL: *** we went all in on termination, okay. Well, case law is clear that when presented with a petition for termination the court has many options available to it, one of the options being to reduce the maintenance but not terminate it or modify the maintenance but not terminate. So even though we didn't request a modification we requested termination, and even though Lorena Miller didn't file a petition to modify, to set a dollar amount not linked to income from employment, Your Honor had the authority to do what you did under section 510. It was one of the available options is to set it at a

dollar amount based on the current circumstances and recognition of the fact that Mr. Miller was no longer earning income from employment.

We didn't appeal that order. Mr.—Lorena Miller appealed it, and we argued this on appeal. We said she got exactly what she asked for. She got your judgment reversed, which reduces her maintenance from [$]1300 to zero. We paid the [$]1300 a month all the way until the mandate came down. We would have kept paying it because Your Honor had the authority to modify the maintenance to [$]1300 a month. Your—your decision was correct and within your authority, because even though we only asked to terminate it that puts the issue before you. So you had jurisdiction to set the maintenance at a dollar amount not linked to his income from employment.

As [Lorena's counsel] correctly sets forth in paragraph 5 of [her] complaint for declaratory judgment, the effect of the appellate court mandate was to take us back to prior to your ruling. So you're setting it at $1300 disappears, so we're left with the prior order, which is maintenance is 41.44—I'm sorry—21.44 percent of Mr. Miller's gross income from employment. If he's had income from employment[,] he owes maintenance. So, I mean, I guess that's a factual issue when we get to it if they want to pursue their rule to show cause.

But the only thing we're determining today is what is the operative order. It's the amended order on posttrial motions entered January 8th, 2008. Your order setting it at $1300 was well within your authority and within the scope of, even though our petition sought to terminate it, it brings into play all of the available options to the Court under section 510.

So we didn't ask for the $1300 to be vacated; Lorena Miller did. And this was argued on appeal and they chose not to raise it on—they chose not to respond to the argument on appeal rule either.

THE COURT: So had that communication not to terminate maintenance been filed your position is it would have operated in a sense that once Mr. Miller stopped working he would have stopped paying because he didn't have any income coming in, therefore nothing to pay 21.44 percent of?

COUNSEL: Correct. So he still has a maintenance obligation, you just apply the formula and it kicks out the number zero.

THE COURT: Got you. All right."

¶ 29    On November 30, 2020, the court expressed its intention to grant Jeffrey's motion for declaratory judgment and deny Lorena's (count I in her petition). It entered an order doing so and noted that it found moot Lorena's petition for rule to show cause (count II). The order, however, expressed that Lorena was given leave to file a petition to establish maintenance. In December 2021, Jeffrey filed a supplemental response to count III of Lorena's petition for declaratory relief, rule to show cause, and other relief (relating to appellate attorney fees). On January 14, 2021, the court entered a final order denying Lorena's complaint for declaratory judgment and granting Jeffrey's motion for declaratory judgment, and ordering Jeffrey to pay to Lorena $16,500 for appellate fees.[5]

---

[5]Jeffrey moved to offset the fees, claiming that from January 1, 2019, through June 30, 2020, he involuntarily paid Lorena $30,200 in maintenance in accordance with court orders then in effect, namely, the trial court's order of May 6, 2019, setting his maintenance at $1300 monthly.

¶ 30                    2. Petition to Reinstate Maintenance and Other Relief

¶ 31    On January 12, 2021 (two days prior to the court entering its final order concerning the relief Lorena sought in her original petition), Lorena filed a four-count "petition for reinstatement of maintenance, modification of amended judgment for dissolution of marriage, to establish temporary and permanent maintenance, and other relief." In count I, Lorena moved to reinstate maintenance on the bases that the 2007 dissolution judgment granted permanent maintenance, and the amended 2008 judgment revised the formula for calculating maintenance but left intact the requirement that the obligation be permanent. Further, she summarized the relevant proceedings thus far, noting that, on September 19, 2018, Jeffrey moved to modify or terminate maintenance and, although on May 6, 2019, the trial court modified his obligation by reducing it, on April 27, 2020, this court *reversed* that relief on appeal. As such, the reversal returned the parties to the status quo as it existed prior to the trial court's May 6, 2019, order. However, the trial court had recently granted Jeffrey's petition and declared that he had no obligation to pay maintenance (effective May 1, 2019), since the 2008 amended judgment premised his obligation on the receipt of income from his employer, and he no longer had employment income. Accordingly, Lorena argued, the trial court's original intent to grant *permanent* maintenance and this court's intent to restore Jeffrey's *existing* maintenance obligation to her (by reversing the trial court's reduction thereof) had been "thwarted and rendered for naught." She noted that Jeffrey had effectively been granted a termination of his maintenance obligation, although this court's reversal reflected that even the modification had been unwarranted. Accordingly, Lorena argued that it was necessary

---

He therefore requested that Lorena be ordered to pay him $13,700 in reimbursement. The trial court ultimately granted that motion on September 29, 2021.

that the court modify any perceived requirement in the 2008 amended judgment that Jeffrey's maintenance obligation was tied to employment, and reinstate periodic maintenance, as required by the February 9, 2011, court order, and as maintenance existed prior to the May 6, 2019, modification (that we reversed) in the amount of $3000 monthly effective May 1, 2019.

¶ 32      In count II, Lorena pleaded alternatively, incorporating many of the foregoing allegations, that a substantial change in circumstances had occurred since the 2008 amended judgment and, to the extent that the 2008 judgment premised maintenance on Jeffrey's receipt of income from employment, modification was necessary.   In count III, again incorporating the foregoing allegations, Lorena requested temporary maintenance and, in count IV, permanent maintenance retroactive to May 1, 2019.

¶ 33      In response, Jeffrey argued, in part, that any proceedings before the trial court based on his 2018 petition to modify or terminate maintenance were irrelevant, given this court's ultimate order and, further, that this court's order was "absolutely irrelevant" to the current proceedings.

¶ 34      The case was transferred to Judge Charles E. Peterson.   On May 10, 2021, the parties appeared before the court for a hearing on Lorena's petition.   In closing arguments, Jeffrey's counsel noted, in part, that he did not envy Lorena's position because:

> "[T]he appellate court screwed this up. You can put that on the record. In—in the
> briefs this issue was addressed. I specifically raised in the brief if you give Ms. Miller what
> she's asking for maintenance will be set at zero, so why are we here on appeal?
>
> Because in her opening brief she asked that the appellate court direct the trial court
> to deny Mr. Miller's petition based on a failure to prove a substantial change in
> circumstances. I argued in our brief if you do that the maintenance is zero.  *** And then

at oral argument it came up and here the appellate court justices enter a decision doing exactly what I said in our brief, if you do this maintenance will be set at zero.

And Judge Cruz correctly found that maintenance based on Judge Spence's formula is zero. That is not an issue before Your Honor. That issue was resolved by Judge Cruz."

Jeffrey's counsel also argued that the only thing relevant from *Miller II* was the mandate itself. As to the 2008 amended judgment, Jeffrey's counsel emphasized,

"When you read the amended order on posttrial motions, Judge Spence clearly and directly says exactly what he believes and what he intends permanent to indicate with regards to the maintenance award, because he changes the formula for the maintenance from all income to only income from employment and not to include passive income or income from investments.

That was a conscious decision Judge Spence made after a contested trial and ruling and a year of litigation on posttrial motions. Judge Spence mapped the course for both of these parties, and what that course was is Judge Spence clearly said: Mr. Miller, you're going to be burdened heavily for four years, no doubt about it. You're only going to get 45 percent of the nonretirement assets. You're going to pay child support. You're going to pay 41 percent of your gross income as maintenance."

He continued that Judge Spence specifically established a formula for maintenance that ended—was automatically reduced to zero—upon retirement because there would no longer be income from employment. According to Jeffrey, Judge Spence contemplated retirement and changed his mind between his original decision and the amended order and posttrial motions to order maintenance only if Jeffrey had income from employment.

¶ 35    In Lorena's counsel's closing argument, he noted, in part,

"*** we can argue till the cows come home about what Judge Spence said, but good news is we know exactly what he said because he wrote it down. And in not one but two places in the original judgment Judge Spence says the Court—quote, paragraph 29: The Court finds that the evidence clearly established that Lori will never have a similar earning capacity as that of Jeffrey. The Court having considered all the facts of this case finds that this is an appropriate case for maintenance and that maintenance should be permanent.

And I understand that permanent might not mean permanent in the vernacular of the law, but it's pretty clear that Judge Spence didn't say, you know, when Mr. Miller retires[,] I don't think he's going to have to pay anymore. Those words don't appear in that judgment at all."

¶ 36     On August 9, 2021, the court issued a written decision denying Lorena's petition to reinstate maintenance. Lorena moved the court to rule on the remaining counts (counts II-IV) of her petition. On September 29, 2021, it denied them. On October 19, 2021, Lorena filed her notice of appeal.

¶ 37                                II. ANALYSIS

¶ 38                                A. *Res Judicata*

¶ 39     Lorena argues first that the court erred in granting Jeffrey's petition for declaratory judgment because it was barred by *res judicata.* She asserts the ultimate question in the cross-petitions for declaratory relief was whether Jeffrey had a duty to pay maintenance after he retired from gainful employment, but this court in *Miller II* previously rendered a final judgment on the merits, on an identical cause of action, between the same parties. Specifically, Lorena asserts that Jeffrey's declaratory judgment action relied upon his assertion that he was terminated from/retired from employment, had no income from employment, and, thus, had no duty to pay maintenance.

However, whether Jeffrey's retirement impacted his duty to pay maintenance was already litigated in prior proceedings that led to *Miller II*. Lorena notes that the same "cause of action" requirement for *res judicata* applicability exists if separate claims arise from a single group of operative facts, regardless of whether the claims assert different theories of relief. Further, she notes, the doctrine applies not only to claims that were raised in the prior proceeding, but to claims that *could* have been raised. Lorena urges that, where Jeffrey's 2018 motion to terminate maintenance and his 2020 declaratory judgment action both depend on the operative facts of his obligation to pay maintenance in light of his loss of employment, the trial court should have barred Jeffrey's current claim because it could have been raised in the 2018 proceeding but was not. Lorena argues that Jeffrey's current success on a claim that could have been raised earlier acts to nullify this court's 2020 decision that Jeffrey had not established that maintenance should be terminated or modified due to his loss of employment.

¶ 40    In response, Jeffrey asserts that the parties' cross-requests for declaratory judgment primarily disputed what court order applied to his maintenance obligation: he relied on the 2007 and 2008 orders, while she relied on the 2011 order. Thus, he contends that Lorena's *res judicata* argument is "tortured." According to Jeffrey, relying on *Bhutani v. Barrington Bank and Trust Company, N.A.*, 2015 IL App (2d) 140972, ¶¶ 21-22, for *res judicata* to bar his motion for declaratory judgment, his original petition to modify/terminate maintenance would have had to share an "identity of issues" with his motion for declaratory judgment. According to Jeffrey, the only issue raised in his 2018 petition to modify/terminate maintenance was whether there had been a substantial change in circumstances warranting the termination of his obligation to pay maintenance. In contrast, he contends, his declaratory judgment action asserted that a dispute existed as to the meaning and effect of the February 9, 2007, judgment, and the January 8, 2008,

amended order. "Whereas Jeffrey's petition to modify/terminate maintenance sought to terminate his duty to pay maintenance, his motion for declaratory judgment sought to determine what his duty to pay was based on existing orders." As to his failure to raise the issue earlier, he asserts,

"Once Jeffrey substantially prevailed in the trial court, the issue of what Jeffrey's maintenance obligation was under the terms of the original judgment and amended order on posttrial motion became moot because those orders were superseded in their entirety by the trial court's order establishing Jeffrey's maintenance obligation in the amount of $1,300.00 per month. If the trial court had denied Jeffrey's petition to modify/terminate maintenance, then the issue of how much maintenance Jeffrey was obligated to pay under the terms of the original judgment and amended order on posttrial motion would have remained before the trial court. Jeffrey did, however, arise the issue before this court in his appellee's brief in the prior appeal."

¶ 41     After recounting where, in his prior appellate brief, he "raised" the issue, Jeffrey suggests that, had Lorena truly believed that the February 9, 2011, order established his current maintenance obligation, then presumably *she* would have replied to the argument raised in his brief by citing it. Because she did not mention the February 2011 order in her earlier appellate briefs, and "danced around the issue entirely," regarding the "specific issue raised by Jeffrey regarding the amount of maintenance he was obligated to pay under the existing orders now that he had no income from employment," he contends that it is apparent that there was no consideration in the prior appeal of the impact of the February 9, 2011, order on his maintenance obligation. He suggests that, if *res judicata* applies, it is to bar Lorena's assertion that the February 2011 order is controlling, when she previously litigated the issue of determining his maintenance obligation relying solely on the terms of the original judgment and amended order without any reference to the 2011 order. Finally,

Jeffrey comments that analysis of the issue is more appropriate under the doctrine of collateral estoppel, which prohibits re-litigation of an issue actually decided in an earlier proceeding between the same parties, but he concludes that the issue raised in the current action, *i.e.*, whether the 2007 and 2008 orders control to determine his obligation or whether the 2011 order modified and superseded those orders, was clearly not decided in the prior hearing or appeal. He finally concludes that Lorena does not explain how application of *res judicata* or collateral estoppel to bar his motion for declaratory judgment impacts the final outcome in the trial court, considering her own complaint for declaratory judgment was denied by the same order.

¶ 42    In reply, Lorena notes that Jeffrey does not challenge two of the three requirements for the application of *res judicata*, namely, a final judgment on the merits and identity of parties. Rather, she contends, he wrongly claims that the third element has not been satisfied, incorrectly reciting that an "identity of issues" between the former and current proceedings is required. However, she notes, the third element requires only an identity in the "cause[s] of action," which exists if the claims arise from a single group of operative facts, regardless of whether they assert different theories of relief. Lorena asserts that Jeffrey's claim that the only issue he raised in prior proceedings was whether a substantial change in circumstances justified a termination of his maintenance does not assist his position, because it simply states a conclusion without comparing the operative facts involved in the prior and present proceedings. She argues that his claim that *res judicata* does not apply because the prior proceedings "sought to terminate his duty to pay maintenance," whereas the present proceedings "sought to determine what his duty to pay maintenance was based on existing orders," cannot be accepted. The fact that the prior action was a modification action, while this action is a declaratory action, reflects only differing theories of relief, which is not a determinative factor for purposes of *res judicata*. Rather, the determinate

factor is whether the separate proceedings have a common group of operative facts. Here, she notes, the core allegation in Jeffrey's 2018 petition to modify/terminate maintenance was that his employment was ending, and, in the 2020 declaratory judgment motion, he alleged he was not employed and had no income from employment: thus, both causes of action arose from the same operative facts. Lorena also notes that, in his 2018 petition to terminate maintenance, Jeffrey could have raised a claim that the 2007 judgment and 2008 amended order control his maintenance obligation and precluded his obligation to pay maintenance if he did not have income from employment, but he did not. Rather, the 2018 petition alleged only that his retirement amounted to a substantial change in circumstances warranting termination of maintenance. Jeffrey's current claim, she argues, was based on orders from 2007 and 2008 that were ripe and capable of being raised in the 2018 and 2020 proceedings, and his failure to do so bars his action now.

¶ 43    As to Jeffrey's remaining allegations, which Lorena characterizes as being "unsupported by any legal authority," or "irrelevant, foreclosed, or otherwise improper," she notes that Jeffrey's musings about what might have happened if the trial court had denied his 2018 petition to modify/terminate maintenance are speculative and irrelevant. Further, Lorena asserts that, as to his allegations that he mentioned to this court the possibility that a ruling in Lorena's favor on appeal would mean his maintenance would be reduced to zero, Jeffrey is making an improper "attempt to evade this court's 2020 decision by raising an issue that was not involved in this earlier proceeding, *i.e.*, how much maintenance should be awarded to [Lorena.] This amounts to an improper collateral attack on the 2020 judgment. Contrary to [Jeffrey's] suggestion, [Lorena] was not obliged to respond to undeveloped[,] irrelevant issues." She notes that we found that Jeffrey failed to meet his burden of proof, and her position in the prior proceedings was in a defensive posture and, thus, she had no burden to carry. More specifically,

"[Jeffrey] was the only party who sought affirmative relief in the former proceedings in this case. His argument that [Lorena] was obliged to address issues that were not raised by his pleadings, such as the February 2011 court order, must be rejected. This court must also reject [Jeffrey's] insinuation that this court had a duty to address the statements in his brief in the prior appeal regarding the interpretation of the original and amended judgment orders. If [Jeffrey] believed that this court's decision was erroneous, his remedy was to pursue a petition for rehearing or a petition for leave to appeal. Because he did not seek such relief, his current attack is forfeited."

For the following reasons, we agree that *res judicata* bars Jeffrey's declaratory judgment claim.

¶ 44    When a trial court makes no factual determinations and considers only legal arguments when ruling in a declaratory judgment action, we review its decision *de novo*. *Pekin Insurance Company v. Hallmark Homes, LLC*, 392 Ill. App. 3d 589, 592-94 (2009). We also review *de novo* whether an action is barred by *res judicata*. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 43.

¶ 45    *Res judicata* is an equitable doctrine by which a final judgment on the merits rendered by a court of competent jurisdiction operates to bar a subsequent suit between the same parties and involving the same "cause of action." *Id.* ¶ 44. *Res judicata* is a judicially-created doctrine, based on the practical necessity that there be "an end to litigation and that controversies once decided on their merits should remain in repose." *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 49. For *res judicata* to apply, three requirements must be satisfied: "(1) the rendition of a final judgment on the merits by a court of competent jurisdiction; (2) the existence of an identity of *cause of action*; and (3) identity of the parties or their privies." (Emphasis added.) *Lutkauskas*, 2015 IL 117090, ¶ 44.

¶ 46    A cause of action is defined by the facts giving rise to a right to relief, and even if one group of facts gives rise to numerous theories of recovery, there remains a single cause of action. See *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 10. Thus, "[i]n addition to the matters that were actually decided in the first action, the bar also applies to those matters that *could have been decided* in the prior suit." (Emphasis added.) *Lutkauskas*, 2015 IL 117090, ¶ 44. When the same set of facts is necessary to maintain and prove both cases, the causes of action are identical for purposes of *res judicata*, and a party is prohibited from later seeking relief on the basis of issues that might have been raised in the prior action. *Wilson*, 2012 IL 112898, ¶ 12.

¶ 47    Here, the parties do not dispute that the first and third requirements for applying *res judicata* have been satisfied: this court rendered a final judgment on the merits concerning Jeffrey's 2018 petition to modify/terminate maintenance and the parties in that action are identical to those before us now. Thus, we must determine whether there exists an identity in cause of action. To do so, we must apply the "transactional test" by which "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 310-11 (1998). Specifically,

> "Under this principle, the dismissal of a single theory of recovery against a particular defendant operates as a final adjudication of all claims based on other theories of recovery that *could* have been brought as part of the initial action, as long as they arise from the same core of operative facts. Therefore, simply alleging a new theory of recovery is insufficient to assert a different cause of action, where multiple theories of recovery are predicated on the same core of operative facts." (Emphasis added.) *Lutkauskas*, 2015 IL 117090, ¶ 47.

¶ 48    When Jeffrey filed his 2018 petition to modify/terminate maintenance, he asked the trial court to terminate his maintenance obligation, as established by the February 2007 dissolution judgment, due to his loss of employment.  Jeffrey's 2018 claim sought termination on the theory that the loss of employment constituted a substantial change in circumstances.  At that time, it was understood and undisputed that Jeffrey was paying to Lorena permanent maintenance at a rate of 21.44% of his income, accomplished by paying $3000 monthly with an annual "true-up."  The trial court reduced maintenance to $1300 monthly, but we reversed and held that Jeffrey had not met his burden of establishing a substantial change in circumstances that warranted a reduction or termination.  Our reversal served to restore the parties to their status quo prior to the trial court's order, *i.e.*, where Jeffrey had been paying to Lorena permanent maintenance at a rate of 21.44% of his income, accomplished by paying $3000 monthly with an annual "true-up."

¶ 49    Jeffrey's attempts to assert that he is now raising a different "claim," namely whether the 2007 and 2008 orders control to determine his obligation or whether the 2011 order modified and superseded those orders, must fail.  Our supreme court, referencing the Restatement (Second) of Judgments, has explained that the transactional approach is pragmatic and, thereunder, a claim is viewed in "*factual* terms" (emphasis added.) and is considered,

> " 'coterminous with the *transaction*, regardless of the number of substantive theories, or
> variant forms of relief flowing from those theories, that may be available to the plaintiff;
> *** and regardless of the variations in the evidence needed to support the theories or
> rights.' " (Emphasis added.) *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290,
> 309 (1998) (quoting Restatement (Second) of Judgments § 24, Comment *a*, at 197 (1982)).

Moreover, the court reiterated that, under the transactional test, the second claim is extinguished even though the plaintiff is prepared in the second action to present grounds or theories of the case

not presented in the first action or to seek "remedies or forms of relief not demanded in the first action." *Id.* at 312 (quoting Restatement (Second) of Judgments § 25, at 209 (1982)).[6]

¶ 50     Here, the same core operative facts or same "transaction" formed the basis of both Jeffrey's 2018 petition to terminate maintenance and his 2020 petition for declaratory judgment: (1) his loss of employment, (2) its effect on his maintenance obligation, (3) as established by the dissolution judgment. Jeffrey is correct when he asserts that we did not analyze and decide in *Miller II* whether the 2007, 2008, or 2011 orders controlled his maintenance obligation. Yet, that is because he did not, in 2018, seek relief on that basis. He did not ask any court to make that determination, but he *could have*. Indeed, theoretically, he could have pursued both theories of relief in the 2018 petition, as the 2007 and 2008 judgments that he now relies upon for declaratory relief to effectuate a

---

[6]A declaratory judgment action may be barred by *res judicata*. Specifically,

"That there has been a prior adjudication between the parties bears on the allowance of a declaratory action. As is the case with other types of action, *an action for a declaration may not be employed to relitigate a claim already adjudicated*, or to evade the effects of preclusion with respect to issues already determined. Neither will a declaratory judgment be available to assert technical defects or mere error in a prior judgment. But when there is a basis for relief from the prior judgment, a declaratory action may provide a suitable vehicle for obtaining such relief. See § 79. Moreover, a declaratory action may be employed to determine the meaning of an ambiguous judgment; here the declaration would not derogate from the binding effect of the prior decision, but would specify what was decided." (Emphasis added.) Restatement (Second) of Judgments § 33, Comment *a* (1982).

termination in maintenance were certainly available for interpretation earlier. As such, the question of whether Jeffrey's maintenance should be terminated or reduced to zero due to loss of employment was settled in *Miller II*. His current cause of action seeks to obtain that relief by asserting a new theory, but it stems from the same transaction or core operative facts as the 2018 claim and, thus, is the same cause of action for *res judicata* purposes.

¶ 51    Jeffrey cites only *Bhutani* to support his argument that *res judicata* does not apply, but his reliance is misplaced. First, as Lorena correctly points out, Jeffrey misstates the standard for *res judicata* by claiming an "identity of issues" is required. This court in *Bhutani* reversed a trial court's application of *res judicata*, but did so because the claims were unrelated. Specifically, we determined that a foreclosure judgment did not determine the possessory rights of the parties with respect to certain pharmaceutical manufacturing equipment that remained on the property after foreclosure. See *Bhutani*, 2015 IL App (2d) 140972, ¶ 1. In explaining *res judicata*, this court relied on *Lutkauskas* for the principle that, for *res judicata* to apply, there must exist an identity in "cause of action" and we applied the transactional test to assess whether separate claims were, in fact, the same *cause of action* for purposes of *res judicata*. *Id.* ¶ 21. We explained that a claim for possession of equipment is simply not the same for *res judicata* purposes as a foreclosure claim. *Id.* ¶ 25. Thus, Jeffrey is mistaken in his reliance on *Bhutani* as establishing that *res judicata* requires an identity of *issues*, as opposed to *cause of action*.

¶ 52    We note that, to the extent that Jeffrey professes confusion as to how *Miller II* affected the amount of maintenance he was obligated to pay, he made no attempt to seek clarification from this court on that question through a motion or petition for rehearing. Nor, ultimately, did he premise his declaratory judgment action on an attempt to obtain relief from our judgment or any perceived ambiguity in this court's mandate. Instead, upon receipt of our mandate, he unilaterally ceased all

maintenance payments and circumvented our order (or, as Lorena puts it, collaterally attacked our order) by asking the trial court to determine whether his obligation to pay maintenance, as ordered by the February 2007 dissolution judgment and 2008 amended order, should be set at zero, *i.e.*, should terminate, given his loss of employment.

¶ 53   This gamesmanship has proved costly, both literally and figuratively.   The underlying policy behind the doctrine of *res judicata* is to "promote judicial economy and to protect defendants from the burden of having to relitigate essentially the same claim." *A & R Janitorial v. Pepper Construction Company*, 2018 IL 123220, ¶16; see also *Wilson*, 2012 IL 112989, ¶ 12 ("The rule *** is founded on the premise that litigation should have an end and that no person should unnecessarily be harassed with a multiplicity of lawsuits"). Jeffrey asserts that, once he substantially prevailed in the trial court in 2018, the issue of what his maintenance obligation was under the terms of the original judgment and amended order on posttrial motion became moot because those orders were superseded in their entirety by the trial court's order establishing Jeffrey's maintenance obligation in the amount of $1300 per month.  But, had Jeffrey, at that time, raised before the trial court his current argument, it theoretically might have been *accepted* and the amount set to *zero*.   The trial court could have ruled on the petition based simply on its interpretation of the dissolution judgment and declared that, once his employment ended, Jeffrey's maintenance would terminate under the terms of the judgment, and there might have been no need for the evidentiary hearing the court held or the appeal that we considered and resolved.  Instead, in response to Jeffrey's 2018 petition and the theory of relief he advanced therein, Lorena incurred expenses to defend her receipt of maintenance support based on a substantial change of circumstances, experts were hired to assess the parties' financial statuses, the trial court held a full evidentiary hearing, the parties both incurred appellate expenses, and this court held oral argument,

deliberated, and issued a written decision. We rejected the theory of relief that Jeffrey advanced, holding that he had not, on that theory, established a reduction or termination of maintenance was warranted. Thus, Jeffrey's subsequent receipt of declaratory relief reducing maintenance to zero, based on *the same facts that existed when the 2018 petition was pursued*, effectively nullified this court's decision. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 42 ("*res judicata* bars a subsequent action if successful prosecution of that action would, in effect, nullify the judgment entered in the original action"). Judicial economy cannot sanction such a result, and Jeffrey's actions unnecessarily burdened Lorena both in costs for defending the initial petition and prosecuting her appeal, successful efforts that have effectively been nullified, but also subsequently in pursuit of relief upon Jeffrey's unilateral termination of support.

¶ 54   Relatedly, when confronted before the trial court with his failure to raise this issue in 2018, Jeffrey's counsel did not assert that the present claim was not ripe or that it was unknown in 2018; rather, he responded, "why would he bring it up?" In addition to the aforementioned reasons, we suggest that he should have brought it up because, by not doing so earlier, he has now foreclosed his ability to pursue this avenue of relief. See, *e.g.*, *In re McClendon*, 243 Ariz. 399, 402-03 (Ariz. App. 2017) ("While a party may petition for modification of spousal maintenance, *res judicata* prevents the party 'from *obtaining* a modification *** based on facts which could have been raised' in the previous proceeding") (emphasis in original.). Jeffrey chose to pursue termination of maintenance based on a substantial change in circumstances. Although he casts his declaratory judgment action as one seeking a determination of which judgment governs, it is simply a different avenue of trying to obtain relief—an avenue that was available and is based on the same core operative facts that existed during the 2018 litigation.

¶ 55    Finally, we note that Jeffrey announced to the trial court that this court "screwed this up" in *Miller II*, because we did not heed his warnings that reversing the trial court would result in his maintenance being reduced to zero. Lorena is absolutely correct that neither she nor we had any reason to respond to those proclamations in Jeffrey's brief and at oral argument. Jeffrey did not raise that theory of relief in the petition we were reviewing, and the assertions, based solely upon his own interpretation of the judgment, were completely *inconsistent* with his position on appeal that the trial court's order, imposing a maintenance obligation *above zero*, should be *affirmed* in all respects. Ironically, if we were to accept Jeffrey's assertion that he raised the claim before us, then presumably we rejected it, and our rejection would also become law of the case and bar his current claim. In sum, Jeffrey's attempt to claim that his maintenance obligation is reduced to zero under the 2007 judgment and 2008 amended order is barred by the equitable doctrine of *res judicata*.

¶ 56                           B. Declaratory Judgment

¶ 57    Even if *res judicata* does not bar Jeffrey's action, we conclude that the trial court erred where it denied Lorena's petition for declaratory judgment and granted Jeffrey's petition for declaratory relief. Again, when the trial court made no factual determinations, we review *de novo* a court's ruling on a declaratory judgment action. *Pekin*, 392 Ill. App. 3d at 593. Further, "[i]nterpretation of provisions in a divorce decree are governed by the same rules pertaining to the construction of contracts." *In re Marriage of Kekstadt*, 85 Ill. App. 3d 952, 954 (1980). As such, we construe the judgment *de novo* (*Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007)), and our main objective is to give effect to the trial court's apparent intent (*Kekstadt*, 85 Ill. App. 3d at 954).

¶ 58    Lorena argues that the court improperly denied her petition for declaratory relief and granted Jeffrey's petition. She asserts that *Miller II* restored the parties to the status quo before

those proceedings, and the record reflects that, at that time, Jeffrey was paying her permanent maintenance in the amount of $3000 monthly, plus an annual true up "consisting of any amount in excess of the monthly amounts paid and the total annual amount required to be paid for maintenance, *i.e.*, 21.44% of [Jeffrey's] gross income from employment." She contends that the $3000 monthly payment, plus a true up per the judgment, was ordered in February 2011, was entered by Jeffrey's counsel and in agreement by both parties, and unambiguously requires Jeffrey to pay $3000 in monthly maintenance, with no condition expressed rendering that maintenance dependent on him earning a certain amount of income from employment. Lorena notes that the order makes a clear distinction between the unconditional amount of monthly maintenance to be paid ($3000) and the yearly true-up payment, which is to be paid "if any, per the judgment." Accordingly, Lorena asserts, the order treats separately the monthly payments and the true-up payment.

¶ 59 Lorena further argues that Jeffrey's position that written orders which conflict with a court's actual ruling cannot be enforced must be rejected because, even if true, the February 2011 order remains consistent with the parties' agreement and the court's orders. She also argues that Jeffrey's position that the February 2011 order was not effective to vary the terms of the January 2008 amended judgment order because it was simply administrative or derivative, rather than substantive, is "baseless." According to Lorena, the proceedings on February 9, 2011, culminated in signed court orders that remain enforceable. Further, she argues that Jeffrey's assertion that the parties did not intend in the 2011 order to set a base amount of maintenance is incorrect, as the parties also did so in March 2009, when the original uniform order for support was entered and had required $6000 monthly. Both the 2009 and 2011 orders setting the base amount of maintenance coincided with the amended judgment's provision for reducing the total amount of

annual maintenance at the four-year anniversary of the judgment. In addition, Lorena argues that Jeffrey's position unreasonably entails a presumption that Lorena, who was awarded permanent maintenance, agreed to automatically cease receiving maintenance once Jeffrey retired from employment. Indeed, Lorena asserts, Jeffrey's position is further unreasonable because it would empower the payor to unilaterally negate the payee's right to maintenance if the payor had no income from employment, irrespective of the reason. For example, she illustrates, if the payor won a lottery and ceased working, he or she could claim a right to terminate maintenance because there would be an absence of employment income. Lorena argues that such an interpretation of the 2008 judgment, considering the court's awarded permanent maintenance, cannot be countenanced. Lorena concludes that she was entitled to a declaratory judgment that the February 9, 2011, support order mandates a monthly maintenance payment of $3000, irrespective of Jeffrey's income from employment and the court erred in failing to grant her complaint for declaratory judgment and in granting Jeffrey's motion for declaratory judgment.

¶ 60 Jeffrey, in turn, responds that the court's declaratory-judgment decisions were correct, because his February 9, 2011, motion to file a modified order for support was not a pleading and did not seek modification of either the 2007 judgment or 2008 amended order. He notes that the motion was one sentence long, made no allegation of fact, and specifically asked that the court enter the order pursuant to the terms and conditions of the February 9, 2007, judgment. In Jeffrey's view, his 2011 motion requested modification of only the 2009 *support order*, which had also been entered "per the judgment." Jeffrey asserts that Lorena incorrectly asserts that the 2011 order modified the terms of the judgment, and he again asserts that her current argument is completely contrary to her position taken in *Miller II*, where she relied on the original judgment. Jeffrey claims that it was not until after we issued our decision in *Miller II*, which Lorena realized returned

parties to the status quo as of May 6, 2019, that she "stumbled" across her legal position centered on the February 9, 2011, "administrative" order for support. Jeffrey contends that his 2011 motion was simply that, a motion, as opposed to a pleading or petition that would invoke the court's jurisdiction to modify the terms of the 2007 judgment and 2008 amended order. He notes that Lorena has admitted that an order for support is an administrative order, but now argues that it substantively modified the terms of the judgment. Further, to the extent the orders for support conflicted with the original judgment or amended order, the "actual pronouncements of the court control." Jeffrey likens this issue to the entry of a Qualified Domestic Relations order (QDRO), which simply carries out the judgment, but does not become a substantive part of the judgment. Moreover, Jeffrey notes that the trial court originally found that the percentage of maintenance was to be a percentage of income, "*to be paid at* the rate of $6000 monthly, and the balance to be paid by May of the following year." Accordingly, he argues, the phrase "to be paid at" is wholly derivative of the preceding phrase and cannot be interpreted as independently establishing an obligation to pay a minimum of $6000 per month. He explains that Lorena has acknowledged that the original judgment and amended order assigned maintenance in terms of a percentage of income, not as a lump sum amount, so her suggestion that the February 9, 2011, order supersedes and controls over the original judgment and amended order must fail. Finally, he asserts that the fact that notices for income withholding were also entered when the 2009 and 2011 support orders were entered reflects the procedural process requiring any amount withheld to be stated in a dollar amount to be provided to the clerk of the court. Thus, the 2011 support order did not modify the judgment, but simply permitted the issuance of an amended notice for income withholding, reducing the monthly withholding of Jeffrey's income to $3000.

¶ 61    Lorena replies that Jeffrey wrongly asserts that her position is contrary to positions she took in *Miller II* because, before he stopped paying maintenance in June 2020, the circumstances simply provided no reason for her to take a position regarding which order was ultimately controlling. Lorena asserts that the distinction Jeffrey tries to establish between a motion and pleading must fail and is unsupported by his cited authority. Further, she urges that Jeffrey's attempts to compare the 2011 order to QDROs must fail, because a QDRO itself is not a document that establishes a right to property. Rather, it provides the means of receiving property and enforcing its transfer. By contrast, Lorena argues, the February 2011 orders "themselves establish the right to receive a certain level of support, and are not dependent on some other order to accomplish that right." Finally, Lorena argues that it is significant that Jeffrey does not respond to her position that, in addition to the support order entered on February 2011, the court also entered a one-page, handwritten order granting Jeffrey's motion to file a modified order of support and, thus, it was not simply an administrative order.

¶ 62    For the following reasons, we conclude that the court erred. By declaring judgment in Jeffrey's favor and denying Lorena's petition, the court ignored the import of our decision in *Miller II*, the effect of the 2011 support order, and the 2007, 2008, and 2011 orders when read together.

¶ 63    The dissolution judgment and 2008 amended order clearly reflect that the trial court intended to award Lorena permanent/indefinite maintenance. The court's various posttrial orders, including its written opinion letter, which was expressly incorporated into the 2008 amended order, reflect that the court's intent in modifying the maintenance provisions concerned simplifying the manner for calculating maintenance and changing the income assessed from net to gross. Further, the 2008 order distinguishes that, while pre-decree grants, bonuses, etc., will not be considered income, "*post decree* future stock grants, options, dividends and bonuses granted after the date of

[the judgment] of February 9, 2007, *shall be considered part of [Jeffrey's] income for maintenance purposes*." (Emphases added.) Thus, although the modified 2008 order tied the *percentage* to Jeffrey's income from employment (which, we note, the court's opinion letter did not do and that letter was fully incorporated into the judgment) and stated that the percentages did not apply to pre-decree grants, bonuses and options which had been previously divided, nor to income earned on Jeffrey's share of *those* assets "or other passive income," the apparent focus of the court's modifications was to implement a streamlined and simplified approach for determining and implementing maintenance at a time when Jeffrey was working.

¶ 64    To the extent that Jeffrey's counsel argues that Judge Spence purportedly experienced a "major change" in opinion between his letter decision and entry of the 2008 amended order, we disagree. If Judge Spence intended to automatically terminate Lorena's "permanent" maintenance upon Jeffrey's loss of employment income or retirement, particularly in light of the reasons why he found permanent maintenance appropriate in the first place, the amended order would have included terms stating so. Indeed, nowhere in the amended order does the court state that permanent maintenance will cease upon Jeffrey's loss of employment. This is notable also because Jeffrey had argued in his posttrial motion that maintenance should have been denied, permanent maintenance should have been denied, and/or maintenance should terminate permanently after four years. The 2008 amended order again *denied* Jeffrey's requests for those modifications. As such, the trial court's 2020 declaration that the 2007 judgment and 2008 amended order applied to reduce Jeffrey's permanent maintenance obligation to zero upon loss of employment income failed to account for Judge Spence's apparent intent, as expressed in those orders, to award permanent maintenance; his decision not to, in the amended order, modify or eliminate those findings supporting permanent maintenance and leaving in full force and effect the remaining 2007

provisions that were not contradicted or otherwise modified; the overall context of the 2008 amendments and Judge Spence's expressed intent to focus on the net-versus-gross analysis when amending the order; and his omission, in the amended order, of any indication that he intended for permanent maintenance to automatically be reduced to zero upon Jeffrey's loss of employment income. As such, to the extent the 2008 order controls, we interpret it as establishing a convenient process for the parties to assess a maintenance figure while Jeffrey was employed, but not as invalidating his obligation to pay permanent maintenance or to seek modification thereof when employment circumstances changed. The terms simply do not provide that permanent maintenance would automatically cease when Jeffrey lost or retired from employment.

¶ 65    Nor does the provision in 2008, tying the percentage to income from employment, serve to authorize Jeffrey's decision to unilaterally and without court authorization ignore the 2011 order, which remained in effect and required a monthly $3000 payment. In fact, Jeffrey appears to have understood this. He did, in fact, seek court authorization in 2018 to terminate maintenance. This conduct belies his argument that, under the terms of the judgment, his maintenance obligation *automatically* reduced to zero if he no longer had income from employment and that the 2011 order setting payments at a minimum of $3000 monthly was irrelevant. In other words, if the terms of the judgment meant that Jeffrey's obligation to pay permanent maintenance automatically reduced to zero upon a loss of employment then, instead of petitioning the court to terminate maintenance, Jeffrey presumably could have simply stopped paying when his employment ended. He did not, at that time, do so because, as he admitted to the trial court, where the judgment ordered *permanent* maintenance, he believed that he had to obtain a court order before stopping payments which, at that time, were $3000 monthly, plus a true up. Our interpretation of the 2007 and 2008 judgments is therefore consistent with Jeffrey's initial interpretation thereof: they do not provide

that permanent maintenance automatically ceases upon a loss of employment income. Jeffrey's own conduct reflects that he understood this.

¶ 66    Ultimately, Jeffrey did not obtain court authorization to reduce his payments to zero; the trial court reduced payments, and we reversed that reduction, concluding that Jeffrey did not establish the threshold substantial change in circumstances. Nevertheless, even before seeking a declaration from the trial court, he unilaterally stopped paying, assuming that the 2007 and 2008 judgments were, in fact, the only authority he needed. This was incorrect, as described above. It was also incorrect because the 2011 order remained valid and in effect. Even if we were to agree with Jeffrey that the 2011 order did not outright "replace" the judgment, that does not mean it was invalid, had no effect, or did not need to be obeyed. The import of the 2011 order is that, instead of the parties trying to comply with an amorphous percentage as set forth in the 2008 amended order, they *agreed* to modify support by setting a tangible $3000 monthly payment minimum. The order further provides that, if necessary, at the end of the year, Jeffrey will also pay a true up per the judgment, *i.e.*, a percentage tied to employment income. As such, when we reversed in *Miller II*, the effect of our reversal was not to restore an amorphous "pay a percentage of income" maintenance award, it was to restore the most recent order extant, *i.e.*, the 2011 "agreed" order. Indeed, when we held that Jeffrey had not established that a *reduction* in maintenance was warranted, that clearly meant no reduction from what he had been paying, which was $3000 monthly plus the true up per the judgment in compliance with the most recent operative court order, *i.e.*, the 2011 order. Thus, regardless of his interpretation thereof, the 2011 order remained a valid court order, subject to compliance, and it served to execute the underlying judgment by ordering a monthly dollar amount approximating a percentage of Jeffrey's income. There is simply no justification for Jeffrey's unilateral decision to cease making payments, when the 2011 order

remained valid and no court had set it aside. See *e.g.*, *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶ 57 (rejecting an argument that, even if, under the Dissolution Act and an agreed order, maintenance payments automatically ceased upon the former wife's cohabitation with a new partner, the former husband was not justified in simply ceasing his payments and, therefore, the trial court did not abuse its discretion in holding him in contempt; " ' One is justified in refusing to comply with a court order only if such order is utterly void *** If the court had jurisdiction of the subject matter and of the parties to the proceeding, then its order must be obeyed until such time as it is set aside by the issuing or reviewing court.' " (*quoting Faris v. Faris*, 35 Ill. 2d 305, 309 (1966))).

¶ 67   In sum, the court erred in declaring that the 2008 amended order governed Jeffrey's maintenance obligation such that permanent maintenance automatically reduced to zero upon his termination of employment and *Lorena* bore the burden of seeking a continuation of maintenance. Rather, the orders collectively demonstrated Judge Spence's apparent intent in the 2007 judgment and 2008 amended order to require Jeffrey to pay permanent/indefinite maintenance to Lorena. The 2011 order, the most recent maintenance order extant, which was an agreed order, acted to effectuate the 2007 judgment and 2008 order, by requiring $3000 monthly, plus a true-up, if any, per the judgment. To reduce or terminate that amount, Jeffrey must establish a substantial change in circumstances. To the extent he wishes to do so solely based upon his loss of employment, we have rejected that claim and it is now barred. Accordingly, the trial court erred in granting Jeffrey's petition for declaratory judgment and in denying Lorena's petition, which requested a declaration that Jeffrey's maintenance obligation remained $3000 monthly, retroactive to May 1, 2019. Therefore, Lorena's petition to reinstate maintenance or modify the judgment is moot and the court's subsequent decision denying that petition is vacated. On remand, the court shall reinstate

Jeffrey's maintenance obligation pursuant to the February 2011 order, retroactive to May 1, 2019. Further, the court will resolve any ensuing arguments concerning offsets (if any), and attorney-fee petitions (if any) that arise in light of our decision. We note that this decision does not serve to bar future petitions to modify or terminate maintenance based upon a substantial change in circumstances, if such a change can be established subsequent to the last court order resolving a petition to modify maintenance (*i.e.*, since May 2019). See, *e.g.*, *In re Marriage of Connors*, 303 Ill. App. 3d 219, 226 (1999) ("Courts in modification proceedings allow the parties to present only the evidence going back to the latest petition for modification in order to avoid the relitigation of matters already settled.")

¶ 68                                    III. CONCLUSION

¶ 69     For the reasons stated, the judgment of the circuit court of Kane County is reversed in part, vacated in part, and remanded with directions.

¶ 70     Reversed in part, vacated in part; cause remanded.